The primary issue in this deal is claim construction. It's construction of the claim term PDA, which overbroadly construed the term PDA so broad that it doesn't even require personal data, which is the P and the D in PDA. The personal data such as calendar appointments and contact lists, addresses, and phone numbers that are used for PDA performing its primary defining function as an electronic day planner and address book. The board's overbroad construction disregards the P and the D in the term PDA to leave out the most basic defining features of a PDA, which is its handling of personal data. But most important to this appeal is the overbroad construction also leaves out the other most basic defining feature, which is how the device handles the personal data with synchronization between the device and the host computer. At the time of filing of this patent, I guess that was March 1998, did you supply any kind of dictionary definition or technical definition that demonstrates that the understanding to one of ordering a skill in the art back in the 1997-1998 timeframe understood the acronym PDA to necessarily mean some kind of handheld device with data synchronization? Or necessarily did these kind of date planning type entries? No, you have to look to the extrinsic evidence to see that. Right, but this would be an example of extrinsic evidence, these types of technical definitions that I'm talking about. Yes. Because they're obviously not inside the patent. There are references to some features of a PDA. Most important, there's a reference to the primary example of a PDA, which is the Palm Pilot, which was the de facto standard for the PDA at the time of the filing of the application. Were there other PDAs out on the market at that time? Yes. The extrinsic evidence that we put into the case identified a collection of over 40. Right. And so... So why do we say that the Palm Pilot was the model? It had become the de facto standard from looking back to the first device, the Apple Newton, where the phrase was coined by the Apple CEO, John Sculley, leading up to the time of the filing of the application. And the Palm Pilot, I believe it was the Palm Pilot 3 at that point, was the best selling product. Right. But, I mean, I guess what you're asking us to do is understand the term PDA and take features from the Palm Pilot and infuse that into the meaning of the word PDA, right? Its most important feature. Right. But I guess the concern is that, therefore, then, you know, why wouldn't, under that logic, we'd have to stick in the microcontroller from the Palm Pilot and the exact type of memory that was used in the Palm Pilot and so on and so forth, you know, the kind of display it had. Did it have backlighting? It goes on and on and on. There's a concern there. Yes, and I see that concern, but that concern is resolved by looking at the context of this invention. So it's not only looking at the history of the phrase PDA and how it was coined and what the purpose of a PDA was to replace an electronic day planner and the reason why this two-way synchronization function is the most basic defining feature. So that's the history of the PDA and how it came about. PDA was to replace electronic day planners and had to have this central most basic defining function of synchronization to accomplish its purpose and goal. Then you look not only from the history of the term PDA to the context of the invention. In this invention, the whole purpose of it was to allow for wireless syncing. It doesn't say that in the patent, though. It doesn't say the word syncing anywhere. I see it, and the way I see it is you look at what is the purpose of the invention. If you look in the description in the background, you see the shortcomings of the PDAs. One of the primary shortcomings that's listed in what shows the purpose of the invention is that at the time of the filing of the application, the Palm Pilot and all the other PDAs required a physical connection between the PDA and the computer to accomplish this most basic purpose of the device. Right, and then the insight, the innovation here, the leap forward was let's stick a laser on the PDA so now it can communicate to the host. Exactly. Instead of a laser beam, instead of some kind of physical electrical connection to the host. Absolutely, and it's a wonderful invention. At the time, we all take it for granted now with our smartphones, with our wireless syncing, but at that time, the device, you had to physically connect it to your host computer or have a cradle on your desk. In the case of the Palm Pilot, it was called the Hot Sync Cradle, not just any cradle, a Hot Sync Cradle. If you traveled with your PDA, you had to lug that thing around or at least remember to bring your cable. And then amazing innovation that this provided was the wireless syncing. Now, we have a different kind of wireless now that we all take for granted, but at that time, it was a wonderful invention to free yourself, free the Palm Pilot from the Hot Sync Cradle. And that device, you could use this wireless communication, LED or infrared laser, and what you ended up with was wireless syncing. That's what you got. That's what the purpose of it. So it makes absolutely no sense to have a definition for PDA that doesn't even include synchronization, the most basic defining feature of a PDA and its definition, and then the most basic purpose of the invention. But doesn't the spec lead us to a definition of PDA as this particular inventor understood and wanted us to understand the term PDA? PDAs are small, substantially hand-sized computers that are used for storing, manipulating, and retrieving a defined amount of data. I mean, that's a very basic definition, but it also indicates to the reader that this inventor wanted to go broad. Like any handheld computer that you can stick a laser on so it can communicate with a host computer or be used as a barcode reader or be used as a remote control. That seemed to be the genius of this invention, and it didn't say anything about data syncing. That's my problem. Well, there's a couple of reasons why you know that's not an all-encompassing defining invention. It's not the situation where you would say this inventor is acting as a lexicographer and trying to define the claim term as something different from what the ordinary meaning is in the art. You have the beginning of a definition, you have a few features, and you know it's not an all-inclusive definition because it doesn't even include personal data. So, to say that when there's some features listed for PDA, and then to say, well, the inventor wanted to go broad there, so we're not even going to include the P and the D in the PDA, that doesn't make any sense. And then the board confirmed that itself, because when the board, even though the petitioner was trying to point to this as a lexicographer-type situation, the board rejected that. The board took that language in the spec, added to it, took away from it, to come up with their definition. So, even the board recognized that this was not a lexicographer situation where you had an all-encompassing defining definition in the spec. Right, it was willing to understand that after reading the remainder of the spec, there was also this notion of exchanging data with a host computer. Yes. So, that was the extra add-on to the very broad statement of what a PDA is at the very beginning of the spec. Yes, and they came close. They almost got there, but what they didn't specifically define, or at least later they characterized this exchanging as, when I first saw that claim construction, I thought, great, we got it. That's exchanging the information is the synchronization that belongs there. Later, the board clarified, or maybe that's what it meant from the beginning, that this exchanging of information was just basic uploading and downloading, not the two-way synchronization that allows a PDA to form its most basic function of replacing the old pen and paper. So, the board got close, but they didn't get all the way there. And if you look at some of the things the board did, which misled them into coming up with this overbroad construction, one of the things is they looked at a reference in the spec to the PDA, the barcode scanning feature of the PDA, providing substantially increased function to the PDA. That's column two, line 17-21. So, a reasonable way, the only way that you can look at that language in the spec is to say this invention, this wireless syncing invention that used a laser then allows additional functions of barcode scanning. So, you have a PDA with all of its defining features, and then you substantially increase its functionality by adding barcode scanning. That's what the spec says. The board flipped that around and said, oh, well, that means a PDA can have, not even require personal data or functioning as electronic date planner. It would only be a barcode scanner. And that's just a complete misreading of that language of the spec. You're into your rebuttal time, but don't you want to touch on BRI? Actually, I don't. Okay. I do want to say one thing, and that is I understand from reading the COSO opinion that we have a binding precedent from another panel. I did not come here to argue the issue, understanding that we had binding precedent. But we're not waiving those arguments to the extent there's been an in-bank request to file a petition. And so I think those issues are still in play, but I certainly didn't plan on being on the tip of the spear of that argument today. All right. Thank you. Appreciate your time today. Take your time on that. Thank you. My goal is just not to drop anything. I always admire counsel when you put a glass of water up there. May it please the Court. The Post and Counsel is correct that there really is only one issue before the Court, and that has to do with the construction of PDA. And, in effect, what we've heard is all sorts of different ways to improperly limit the express definition of a PDA that's set forth in the patent to read in definitions and limitations that are not mentioned in the patent, particularly with respect to synchronization, and that are, at best, merely a term for personal data application that would encompass software that would be representative of one of many possible embodiments in the patent. And I'd just like to respond to a couple of the points that were made, and that has to do with the acronym PDA, Personal Data Assistance. There's been a lot of argument about the fact that the acronym, you can read it to say personal data, and therefore you have to define the term personal data. But that's a misapplication of what the word data is intended to modify. When you look at the definition of personal data assistance that the inventor decided to set forth, you have a personal device, a small handheld device that you can carry around, and it is a data assistant. It's a processing device that can store and manipulate a defined amount of data. And this is also consistent with the way that PDA was defined and considered in all the other prior art, where they looked at it not as a personal data assistant, but as a personal digital assistant. And in the brief, the patent owner's opening brief, I think around page 23, they treat personal digital assistant and personal data assistant as synonymous. And you can never parse personal digital in that way, because it makes no sense. It's a personal device that's a digital assistant. Here we have a personal device that's a data assistant. And as further evidence that the word personal is not referring to the type of data, we look at the patent and it uses that term in one other place where it's talking about the host computer. And it says our host computer can be a personal computer or it can be a network device. And again, this is not talking about the type of data that you have. Data is data. It shouldn't matter whether the data is my birthday or the date for the next Super Bowl. It shouldn't matter whether I'm using the device to inventory the books in my house or inventory the books in the library. We're not talking about the specifics. And if you get into the weeds about what a personal data is and what a personal application is, you have all sorts of indefiniteness type issues. Because then it gets into the intent of the user and the intent of how it's being marketed. And I'll specifically note that... There were references, for example, to shopping, but also inventory. Yes, sir. And I'd also like to specifically note that in the decision instituting the IPR, and this is at A196, the board actually recognized that what constitutes personal information is undefined. We have no idea about what that could possibly be. Under Phillips, which would be the lowest and most narrow construction that would apply if the CUSO speed decision gets reversed en banc, this board and the patent should be construed in accordance with the express definition of PDA that's set forth in the patent. The patentee was being their own lexicographer. They have a definition that's clear, unmistakable, and equivocal. And that issue came up in one of the earlier discussions today. The patentee said very broadly, I want, in the context of my patent, a PDA to be a small handheld device for storing, manipulating, and retrieving a defined amount of data. And the reason that the patentee went broad is clear, because the invention has nothing whatsoever to do with the functionality internal to the device. You could run software for inventory. You could scan barcodes and store them. You can use it for a calendar or a date book, although you can certainly run calendar or date book applications without synchronizing. It might not be the best thing to do, but there's no reason why you need that. But what the patent says at the top of column three is that the microprocessor interacts with an operating system that runs selective software depending on the intended use of the PDA. And there's nothing in the patent that limits what the device does with the data that it sends and receives. The entire purpose is to just make it easier, give you an alternative way to send the data, give you an alternative way to read the data. As far as synchronization being a necessary and defining feature, the only evidence that we have of that is the definition that Pat Nona's expert constructed by looking at a variety of devices that he claimed were PDAs. And as your honors noted, there are a whole host of other features that could be incorporated into it, and they just cherry picked one that might be important in the market, but is not a necessary and defining feature of PDA because we see in the definitions that are of record from Bike Magazine, from Microsoft, the Q Dictionary of Computing, various patents that we cited, that they all define PDA in the same time period in ways that do not require synchronization. Once you can transfer data back and forth, which presumably encompasses synchronization and encompasses data backups, emails, faxes, any way and any use of that would be encompassed by the inventor's broad definition as slightly amplified by the board when viewing it in the broadest reasonable interpretation standard, recognizing that the device sends and receives data. One of the other issues that the patentee argued about was that the definition is over-inclusive. There are two points. First, the examples that they gave about it being over-inclusive is by pointing to a series of programmable Texas Instruments calculators, and their position is that one of skill in the art would understand that these are not PDAs. Well, first, there's no evidence in the record that their expert ever opined on whether or not these devices were PDAs. They certainly could fall within the inventor's broad scope, and there's no reason why the inventor's idea of using a laser scanner to send and receive data wouldn't work equally well on those devices. So, that doesn't resolve their question. The other issue is that while they're arguing it's over-inclusive, they're also essentially poo-pooing the fact that their own definition is over-inclusive, because their expert considered approximately 40 devices that he said were all PDAs, and they have synchronization. And yet, when you look in detail, you see that several of those devices, the Windows CE devices in particular, self-identified at that time by saying that we use Windows CE. We are not PDAs. We are, in fact, handheld computers. So, you have a definition that's being proposed that will encompass devices that are not PDA, and there's no reason to read limitations into the claims that don't help somebody determine whether or not their device might fall within the scope of the claims. And, in fact, their own expert, when asked whether a device that he thought wasn't a PDA would become one if you loaded personal software onto it and you gave it the ability to synchronize, couldn't answer the question. He said it has to do with whether or not the device implemented those things very well, and it had to do with the intent. And that all goes back to the fact that the term PDA at this time, and until now, is a marketing term at its base. It's not a well-defined term, and one of the articles that we cited actually says, and by 1997, and I'm referring to the article as A2057. Is that the right one? Oh, I'm sorry. A2065. From 1997, a consensus on a specific product definition has not been reached. But what we see is that none of them, none of those definitions use the word synchronize in the written record of the time. And while synchronization might be a relevant feature, it's not a defining feature. And, in fact, the board itself, in the context of the proposed amendment, made the determination that the idea of synchronization is not necessarily inherent in a PDA. And that, arguably, if we had no definition in the patent, and you were just left with the naked term PDA and had to figure out what it meant, it might be worth having this entire debate about what it is and what it isn't. But the patent owner gave us his own definition. Under Phillips, which would apply if the cruise of speed is reversed, Phillips specifically says, and I'll quote to make sure I get the language right, when the inventor acts as their own lexicographer, in such cases, the inventor's lexicography governs. So that's going to provide our floor. There's no reason to narrow it to include a variety of limitations that are not disclosed and not required in any way by the patent and have no bearing whatsoever on any of the elements that are recited in the claims, which are very generic hardware elements that don't recite anything about actually sending and receiving data and don't recite anything about what software is being loaded on the device. If this court upholds the board's construction, then the claims are invalid. There's no arguments on the record that under the board's construction, the prior art does not clearly disclose all the limitations in the claims. If cruise of speed comes in and reverses and the board now applies a Phillips standard of construction, the claims are still invalid because the only difference between the construction under Phillips and under a broadest reasonable interpretation standard is the slight broadening that the panel did to recognize that you can send and receive data. The other differences in the definition between the patent board's definition and the inventor's express definition are essentially non-substantive wordsmith. It's still a handheld device. It might be a little smaller. It can send and receive and process a defined amount of data. The board also found that the proposed amendment was improper for two reasons. The first was that the proposed amendment, which added the limitation, configure to exchange and synchronize data with the host computer, was not supported. And that finding is supported by substantial evidence because in effect there's no evidence whatsoever in the record, nothing in the evidence that mentions in any way synchronization. Unless you take the position that merely exchanging data between two devices is synchronization, at which point it's clear that the devices on the record, the PPT 4100, the Rupert patent, both disclose exchanging data. The Palm Pilot had data synchronization. Exactly, and in fact that raises a much broader situation in that this is, in some ways, this is an absurd situation since the features that the patent owner is trying to read into the claims, synchronization, personal data application, synchronizing of personal data, the idea that they're trying to use is that this was so pervasive in the prior art, this was all over the place, all of these devices had it, therefore you must define a PDA as including these limitations. The patent itself says that a PDA is conventional. And so to read into limitations, read into the claims, limitations that are being justified by the fact that they are in effect inherent in the prior art. What if this was a patent that was directed to a car? And maybe the car had, the invention was some extra add-on feature to the car. And then the spec said a car is a vehicle with four tires and a steering wheel. And one example of a car is a Toyota Prius. Okay, and then ten years later they want to amend their claims where the claim is for a car with a hybrid engine. Would you say that there's written description support for that later amendment? No, Your Honor, because the written description is to show what the inventor considered as their invention. The fact that they refer to a prior art device in this patent, the Palm Pilot in your example, a Toyota Prius, doesn't mean that the inventor had possession of all of the details. I mean you'd agree that the calling card of a Toyota Prius is the hybrid engine. That's the very, very, very first thing you'd think of. But that's not a defining characteristic of a car. And it doesn't show that in the context of the patent, the distinction that the inventor had any appreciation of the distinction between the different types of engines. I mean here it's highly unlikely that the inventor wasn't intimately familiar with the fact that the Palm Pilot synchronized. If he had thought it was in any way important to the invention, if he had thought that anything beyond the mere ability to send and receive data in an improved manner was important, he could absolutely have put that into the claims. He could have put it in the specification and he did it. In your car example, it would be more equivalent to saying here's a car. I want to amend the claims to recite a catalytic converter because every car has one. It's irrelevant to the claims. You could have a device that has all sorts of software and the patent says that it does whatever the software does and it's for its intended use. The patent itself doesn't care whether you synchronize. The adapter, which is the only thing the patent focused on, has no knowledge or care in any way of what software is being run under the hood and of what the data transmission is being used for in any circumstances as long as you can do it. Thank you, Mr. Roberts. Thank you. Mr. Rogers, you've got some time left. Thank you. Just a couple of points. This distinction between personal data assistant versus personal digital assistant, the title of this patent is Laser Enhanced Personal Data Assistant and the patent opens up with references to the device functioning as an electronic day planner. So we're talking about personal data and if you look at the definitions in these magazine articles that are presented, I think it's ironic that the petitioner is bringing forth this extrinsic evidence with magazine articles defining with definitions for PDAs and if you look at them, what they all talk about, each one of them references personal data. They reference the calendar features, electronic day planner features and at the same time, the petitioner is bringing forth this extrinsic evidence. They're supporting and asking you to affirm a definition from the board that reads out these most basic defining features and if you looked in the criticism of the expert report, we have over 40 devices and each one of them has this defining feature, this synchronization. If there's criticisms of the list and references to whether or not it may include something, handheld devices, some other term that could be used, but if synchronization was not a defining feature of a PDA, the criticism of the list is the petitioners would bring forth a device that was known at the time to be a PDA that did not have synchronization and they haven't done that. They haven't done it because they can't do it because every PDA at the time of the invention had synchronization and the extrinsic evidence confirms then that the synchronization should be a part of the definition of a PDA and the board didn't do that and therefore their claim construction is overly broad. I appreciate your time today. Thank you, Counsel. A matter of abstention.